**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| MCGUIRE BEARING COMPANY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MINEBEA MITSUMI INC., NMB (USA), INC., AND NMB TECHNOLOGIES CORPORATION,<br><br>Defendants. | Case No. 2:17-cv-10853 |

## CLASS ACTION COMPLAINT

Plaintiff McGuire Bearing Company, individually and on behalf of the Class of direct purchasers described below, brings this action against Defendants for damages and injunctive relief under the antitrust laws of the United States and upon information and belief, hereby alleges as follows:

## SUMMARY OF THE CASE

1.      Defendants are manufacturers and suppliers of small-sized bearings ("Small Bearings"), as defined in this Complaint, sold in the United States. Plaintiff alleges that Defendants engaged in a global conspiracy that effectively operated to artificially inflate, fix, raise, maintain, or stabilize prices of Small Bearings sold in the United States from June 2003 through the date of the filing of this Complaint. Plaintiff further alleges that the entity that assigned the claims to the Plaintiff could not have discovered, and did not discover, Defendants' conspiracy at a time earlier than February 2, 2015, and that Defendants fraudulently concealed their conspiracy.

2. Plaintiff brings this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased Small Bearings in the United States from one or more of the Defendants or their co-conspirators. This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

3. As a result of Defendants' unlawful conduct, Small Bearings purchasers paid higher prices for Small Bearings than they would have paid in a competitive market, and therefore have suffered injury to their business or property.

<u>**JURISDICTION AND VENUE**</u>

4. Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

5. The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, and 28 U.S.C. § 1331 and 1337. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, Defendants and their co-conspirators transact business in this District.

6. This Court has personal jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Small Bearings throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole,

including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

7.      Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

8.      By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court. Alternatively, there is jurisdiction over the foreign Defendant pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

9.      The term "Class Period," as used in this complaint, refers to the time period from June 1, 2003 through the date of the filing of this Complaint.

10.     The term "Small Bearings," as used in this complaint, refers to those bearings whose outer diameter is 30 millimeters or less. Small Bearings are used in numerous applications, including but not limited to the following automotive applications: air conditioning compressors, alternators, anti-lock braking systems, cooling fans, fuel pumps, motors for electric control systems, starters, steering systems, transmissions, water pumps, wheels, and windshield wiper motors.

11.     The term "co-conspirators," as used in this Complaint, refers to at least the following entities: NSK Ltd., NSK Americas, Inc. and NSK Corporation. The Defendants are

jointly and severally liable for the acts of their co-conspirators regardless of whether or not they are named in this Complaint.

12.     The term "Defendant" or "Defendants," as used in this complaint, refers to, in addition to those named specifically below, all of the named Defendants' predecessors, including Small Bearings manufacturers merged with or acquired by the named Defendants, and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold Small Bearings directly to purchasers in the United States during the Class Period.

13.     References made herein to any corporate entity include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of that entity.

## TRADE AND COMMERCE

14.     During the Class Period, each Defendant sold Small Bearings in the United States in a continuous and uninterrupted flow of interstate commerce.

15.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

**Plaintiff**

16.     Plaintiff McGuire Bearing Company is an Oregon corporation with its principal place of business in Portland, Oregon. Plaintiff was assigned the antitrust claims alleged herein by a direct purchaser of Small Bearings that purchased Small Bearings from one or more of the Defendants during the Class Period.

**Defendants**

17.     Defendant MINEBEA MITSUMI Inc. ("Minebea"), is a Japanese corporation with its principal place of business in Nagano, Japan. Defendant Minebea – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Small Bearings in the United States, including in this District, during the Class Period.

18.     Defendant NMB (USA) Inc. ("NMB USA"), is a California corporation with its principal place of business in Chatsworth, California. It is a subsidiary of, and wholly-owned or controlled by, its parent, Minebea. Defendant NMB USA sold Small Bearings in the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Minebea.

19.     Defendant NMB Technologies Corporation ("NMB Tech"), is a California Corporation with its principal place of business in Chatsworth, California. It is a subsidiary of, and wholly-owned or controlled by, its parent, Minebea. Defendant NMB Tech sold Small Bearings in the United States, including in this District, during the Class Period. During the Class Period, its activities were under the control and direction of Minebea.

20.     To the extent that subsidiaries, divisions, and other affiliates within Defendants' corporate families sold Small Bearings, these related entities played a material role in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Small Bearings would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing or collecting

monies from the members of the Class was authorized, ordered, known to, and approved by their respective corporate parents named as Defendants in this complaint.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

21.     The acts alleged in this complaint to have been done by Defendants were authorized, ordered, and condoned by their parent companies and the acts alleged to have been done by each Defendant were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of their business affairs.

22.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendants are jointly and severally liable for the acts of their co-conspirators regardless of whether or not the co-conspirators are named as Defendants in this Complaint.

23.     Each Defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action both on behalf of itself and all other similarly situated individuals and entities (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3). The Class is defined as follows:

> All individuals and entities (excluding Defendants and any Defendant in the NSK Action, and their present and former parents, subsidiaries and affiliates) that purchased Small Bearings in the United States directly from one or more of the Defendants or their co-conspirators from June 1, 2003 through the date of the filing of this Complaint.

25.      Plaintiff does not know the exact number of Class members, such information being in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

26.      There are questions of law or fact common to the Class, including, but not limited to, the following:

   a.      Whether Defendants engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Small Bearings sold in the United States;

   b.      The identity of the participants in the alleged conspiracy;

   c.      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

   d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

   e.      Whether the contract, combination, or conspiracy caused Small Bearings prices to be higher than they would have been in the absence of Defendants' conduct;

   f.      Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the business or property of the Class members;

   g.      Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Class members;

   h.      Whether the Class members are entitled to injunctive relief and, if so, the nature and extent of such relief; and

        i.     The appropriate class-wide measure of damages.

27.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

28.     Plaintiff's claims are typical of the claims of the Class because Plaintiff is pursuing the claims of a direct purchaser of Small Bearings from a Defendant, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by the Plaintiff is common to the Class.

29.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is pursuing the claims of a direct purchaser of Small Bearings and has no conflict with any other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

30.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

31.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

32.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

33.     The Class is also readily definable and is one for which records likely exist in the files of Defendants.

## INDUSTRY BACKGROUND

### The Small Bearings Industry

34.      The structure of the Small Bearings market makes it particularly conducive to price fixing and market allocation. The Small Bearings market exhibits many of the qualities that facilitate collusion and other improper business behavior, including: (1) substantial barriers to entry; (2) high, and increasing, market concentration; (3) inelastic demand; (4) homogenous or commoditized products (available on a global basis); (5) excess capacity; and (6) opportunities to conspire. Together, these characteristics vastly increase the feasibility of anticompetitive conduct in the Small Bearings industry.

35.      There are substantial barriers to entry into the market for Small Bearings. A new entrant into this market faces significant start-up costs, which include investments in plants, machinery, distribution infrastructure, a skilled labor and sales force, and research and development. The strong pre-existing relationships between market players create an additional deterrent to potential new entrants. Moreover, the minimum efficient scale of Small Bearings production is large and increasing, thereby discouraging new entrants into the market.

36.      The Small Bearings market is highly concentrated. The consolidation in the Small Bearings industry is not only apparent, but a source of pride for at least one of the remaining manufacturers/suppliers. Minebea currently states on its website that "[w]e are the world's leading manufacturer of miniature and small-sized ball bearings, up to 22 mm in external diameter, and ha[ve] a global market share in excess of 60%."

37.      The Small Bearings industry is subject to specific standards, as determined by the industry's trade organization – the American Bearing Manufacturers Association ("ABMA"). The standards applicable to the Small Bearings industry mean that the design and function of

most Small Bearings can be produced by any of the Defendants. Small Bearings (as well as other bearings) are categorized, in part, based on tolerance standards developed by the Annular Bearing Engineering Committee ("ABEC") of the ABMA. Known as ABEC classes, the higher the ABEC class, the better precision, efficiency, and speed capabilities of the bearing. This scale was developed, in part, to assist the user in determining the appropriate bearing for the intended application.

38.     One of the most important determinants in the purchase of Small Bearings is price.

39.     The demand for Small Bearings is highly inelastic because there are no close substitutes. In markets where demand is inelastic, collusion is facilitated as consumers cannot substitute products. Thus, producers can raise prices to supra-competitive levels and increase profits. In a market where demand is inelastic, purchasers can be forced to pay supra-competitive prices.

40.     Because Small Bearings are essential components in various products and are not easily substitutable, Class Members were forced to purchase Small Bearings at supra-competitive prices throughout the Class Period.

41.     As more fully set forth below, Defendants and their co-conspirators had many opportunities to collude, including at industry or trade meetings, distribution-organized events, and in connection with industry-wide campaigns to purportedly address product quality concerns.

42.     During the Class Period, contraction in demand and consolidation in the Small Bearings industry led to an overabundance of production capacity. Excess capacity for production indicates that a market is susceptible to collusive, anticompetitive behavior.

10

43.    The Small Bearings industry is characterized by homogenous or commoditized products.

## DEFENDANTS' ANTITRUST CONSPIRACY

### Government Investigations

44.    Antitrust investigations are taking place in at least the United States, South Korea, and Singapore regarding Small Bearings. To date, the United States' investigation has led to one guilty plea. In South Korea, the Korea Fair Trade Commission ("KFTC") has imposed a "penalty surcharge" against NSK and Minebea. In Singapore, the Competition Commission of Singapore ("CCS") investigated anticompetitive conduct concerning sales of bearings and specifically included "small-sized Bearings."

### United States Investigation

45.    The United States Department of Justice ("DOJ") is conducting an investigation into the Bearings industry, including the Small Bearings industry.

46.    In its 2012 Annual Report (for the year ended March 31, 2012), NSK stated that on November 9, 2011, its subsidiary in the U.S. received a subpoena from the DOJ, which requested that it provide information regarding sales of bearings.

47.    On February 2, 2015, the DOJ announced that Minebea agreed to pay a $13.5 million fine and plead guilty to a one count criminal information ("Minebea Information") charging Minebea with, among other things, "enter[ing] into and engag[ing] in a combination and conspiracy to suppress and eliminate competition by agreeing to fix, raise, and maintain the prices of small sized ball bearings [whose outside diameter is 26 millimeters or less] sold in the United States and elsewhere" from at least "as early as early-to-mid 2008 and continuing until at

least October 2011" in violation of Section 1 of the Sherman Act. Later that day, Minebea pleaded guilty to this charge.

48. According to the DOJ, Minebea and its corporate co-conspirator caused small sized ball bearings to be imported into the United States for sale in the United States.

49. The DOJ alleged that Minebea and its corporate co-conspirator: (a) participated in meetings, conversations, and communications to discuss prices to be submitted to small sized bearings customers in the United States and elsewhere; (b) agreed, during those meetings, conversations, and communications, on prices to be submitted to small sized ball bearings customers in the United States and elsewhere; (c) agreed, during those meetings, conversations, and communications, to coordinate price adjustments requested by small sized ball bearings customers in the United States and elsewhere; (d) submitted prices and price adjustments to small sized ball bearings customers in the United States and elsewhere; (e) sold small sized ball bearings to small sized ball bearings customers in the United States and elsewhere at collusive and noncompetitive prices; (f) accepted payment for small sized ball bearings sold to small sized ball bearings customers in the United States and elsewhere at collusive and noncompetitive prices; (g) engaged in meetings, conversations, and other communications for the purpose of monitoring and enforcing adherence to the agreed-upon price-fixing scheme; and (h) employed measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations."

50. In its May 8, 2015 "Brief Report of Financial Results" for the "Year ended March 31, 2015" ("Minebea's 2015 Brief Report"), Minebea disclosed: "Minebea made an agreement with the U.S. Department of Justice to plead guilty to violating U.S. antitrust laws

concerning the sale of certain small-sized ball bearing products and pay a fine totaling 13.5 million US dollars (1,610 million yen)."

**South Korean Investigation**

51.     NSK reported in its 2012 Financial Report that: "in July 2012, the Korea Fair Trade Commission ("KFTC") conducted an on-site investigation against NSK's Korean subsidiary regarding a potential violation of the Monopoly Regulations and Fair Trade Act of Korea in transactions involving small bearings products."

52.     On November 16, 2014, the KFTC imposed fines of 77.8 billion won ($70.7 million) on nine Japanese and German ball bearing producers for their involvement in one or more of three international cartel activities by global bearing suppliers during the period of 1998 to 2012. The affected companies included NSK, NSK Korea, Minebea, and NMB Korea.

53.     The KFTC identified three cartels: (1) Price-fixing of bearings for commercial sales (7 bearings manufacturers); (2) Price-fixing of bearings for steel facilities (4 bearings manufacturers); and (3) Price-fixing of small-sized bearings (4 bearings manufacturers).

54.     The KFTC found that NSK, Minebea, and their respective Korean subsidiaries, "NSK Korea" and "NMB Korea," participated in price-fixing of small-sized bearings. NSK and Minebea initially agreed to fix the prices for Small Bearings supplied to Korea's global electronic manufacturers such as Samsung, LG, and Daewoo from June 2003 to August 2011. In 2008, they agreed to raise all prices for small-sized bearings.

55.     According to the KFTC, Minebea and NSK drew up detailed plans for price hikes and instructed NSK Korea and NMB Korea to carry them out, which they agreed to do.

56.     Because of the efforts by NSK, Minebea, NSK Korea, and NMB Korea, the KFTC imposed fines of approximately 3.7 billion won (approximately $3.3 million) against NSK and approximately 4.9 billion won (approximately $4.3 million) against Minebea.

57.     In its May 8, 2015 Brief Report of Financial Results, Minebea disclosed that the KFTC "issued an order for corrective action to Minebea and its Korean subsidiary" and fined Minebea 4,912 million won. Further, Minebea acknowledged that the Korea Fair Trade Commission "also announced that it would press criminal charges against Minebea and its Korean subsidiary for violating [South Korea's] Monopoly Regulation and Fair Trade Act."

58.     The size of the "small bearings" in the Korea Fair Trade Commission investigation was 30 mm or smaller.

59.     The Korea Fair Trade Commission reported "sudden drops in bearing prices after the investigation by the KFTC." The KFTC hailed its investigation as "a landmark achievement in the field of international cartels" because of, among other reasons, the long duration that the cartel remained undetected before the KFTC uncovered it, and "the practice of price-rigging in the most concrete manner, covering all aspects including the collusive period, items used, and the scope of agreements."

**Singapore Investigation**

60.     The Competition Commission of Singapore ("CCS") commenced an investigation into the Bearings industry in December 2011 after receiving an immunity application from JTEKT Corporation's ("JTEKT") Singaporean subsidiary, Koyo Singapore Bearings Ltd.

61.     On February 6, 2013, NSK's Singapore-based sales subsidiary, NSK Singapore Ltd. received an on-the-spot inspection from the CCS.

62.     On May 27, 2014, CCS announced that it had issued an Infringement Decision against NSK, JTEKT, NTN Corporation ("NTN"), and Nachi-Fujikoshi Corp. ("Nachi") and their respective Singaporean subsidiaries for violating Singapore's competition laws "by engaging in anti-competitive agreements and unlawful exchange of information in respect of the price and sale of ball and roller bearings sold to aftermarket customers in Singapore." As a result, these entities were fined 9,306,977 Singapore dollars.

63.     The CCS's Notice of Infringement Decision confirms that the Singaporean investigation into anticompetitive behavior by bearing suppliers specifically included and applied to the Small Bearings market. Indeed, historically, bearings plants in Singapore primarily produce Small Bearings.

64.     While the CCS's Notice of Infringement Decision does not mention Minebea or its subsidiaries, Minebea announced in its 2015 Brief Report of Minebea's Financial Results that Minebea and some of its subsidiaries were cooperating with competition authorities in Singapore concerning investigations into anticompetitive conduct occurring in Singapore.

65.     In its Infringement Decision announcement, the CCS also revealed that these entities repeatedly met in Japan between at least 1980 until 2011, where they "agreed on sales prices for Bearings" and "discussed and agreed on the overall strategies" for their "Market Share and Profit Protection Initiative"—an initiative designed to "maintain each participant's market share and protect their profits and sales."

66.     CCS further noted that, "to give effect to the Market Share and Profit Protection Initiative," the parties took a series of actions over the years, including "setting an agreed price list and making a minimum price agreement for Singapore, agreeing on relevant exchange rates to be applied to derive the minimum prices for Singapore, and when the price of

15

steel began to increase, the Parties agreed on percentage price increases and exchanged information on percentage price increases to be applied to Aftermarket Customers in Singapore."

67.     As a result, these companies were found to have engaged in conduct "which includes, amongst other things, price-fixing agreement and exchanges of strategic information including future price intentions, [that] amounts to a single overall infringement with the object of preventing, restricting, and distorting competition." But for this conduct, "uncertainty would have forced the Parties to compete for market shares via more competitive prices or non-price strategies."

**Global Scope of the Conspiracy**

68.     The government investigations, discussed above, reflect the global nature of Defendants' and their co-conspirators' conspiracy, which, in turn, reflects the global nature of the Small Bearings industry. Small Bearings are highly transportable and fungible products, and thus, they are readily exportable worldwide.

69.     The nature of the Small Bearings industry makes it difficult to price-fix products in one geographic market without also fixing prices in other geographic markets. This is because, absent such a global agreement, purchasers could simply fulfill their Small Bearings needs by importing lower-priced Small Bearings from elsewhere.

70.     As a result, during price-fixing meetings in one country or region, Defendants and their co-conspirators frequently would discuss the conspiratorial efforts of their counterparts in other countries or regions.

71.     Minebea's 2013 Annual Report (for the year ended March 31, 2013) referred to its and certain of its subsidiaries' involvement in several competition-related investigations:

**Investigations by competition authorities in Korea, Singapore and the U.S.**

Certain consolidated subsidiaries are currently responding to investigations made by Korean, Singaporean and the U.S. competition authorities on suspicion of attempted violation of relevant competition laws in those countries in relation to the dealing in miniature ball baring [*sic*] products. It is difficult to predict whether or not there would be material impact on the operating results etc. of the Group at this point in time.

72.      Minebea's 2014 Annual Report (for the year ended March 31, 2014) also referred to its (or certain of its subsidiaries') involvement in several competition-related investigations:

**Investigations by Korean, Singaporean and the U.S. competition authorities**
Certain consolidated subsidiaries are primarily responding to investigations made by Korean, Singaporean and the U.S. competition authorities on suspicion of attempted violation of relevant competition laws in those countries in relation to the dealing in the miniature ball baring [*sic*] products. It is difficult to predict whether or not there would be a material impact on the operating results etc. of the Group at this point in time.

73.      On May 8, 2015, Minebea released its "Brief Report of Financial Results" for the "Year ended March 31, 2015" and acknowledged that:

In November 2014, the Korea Fair Trade Commission (KFTC) issued an order for corrective action to Minebea and its Korean subsidiary for violating the Monopoly Regulation and Fair Trade Act (a competition law) in relation to the trading of small-sized ball bearings in Korea. Minebea was fined a total of 4,912 million won (527 million yen). The KFTC also announced that it would press criminal charges against Minebea and its Korean subsidiary for violating the Monopoly Regulation and Fair Trade Act. In February 2015, Minebea made an agreement with the U.S. Department of Justice to plead guilty to violating U.S. antitrust laws concerning the sale of certain small-sized ball bearing products and pay a fine totaling 13.5 million US dollars (1,610 million yen). [¶] A class action suit in relation to the investigations of these cases has been brought against Minebea in Canada. Minebea and some of its subsidiaries are also cooperating with competition authorities in Singapore in investigations there. There has been no significant progress made this fiscal year.

74.      In the Minebea Information, the DOJ charged: "Defendant and its corporate coconspirator entered into and engaged in a combination and conspiracy to suppress and

eliminate competition by agreeing to fix, raise, and maintain the prices of small sized ball bearings sold in the United States and elsewhere."

75.     Also, according to the KFTC, agreements to engage in anticompetitive conduct in local markets followed directives from "head offices" in Japan: "Their Korean branches, NSK Korea and NMB Korea, drew up a detailed plan for price hikes by client *following the instructions and approval from their respective head offices* [located in Japan]. The Korean branch offices agreed to maintain the increased price levels, and acted accordingly."

76.     Similar to the decision and information-exchange structure outlined by the KFTC, the Competition Commission of Singapore ("CCS") described anticompetitive activities engaged in by JTEKT, Nachi, NSK, and NTN, with decisions and instructions communicated to Singapore from their Japanese parent companies. Representatives from the Japanese parent bearing companies met regularly to further the goals of the "Market Share and Profit Protection Initiative."

77.     Additionally, a so-far-unknown representative "of NSK Japan attended Japan Meetings in the period from 6 June 2006 to 14 July 2009. He stated that the main purpose of the meeting was to exchange market information and to agree on a range of percentage price increases for Aftermarket Customers in the Singapore market."

**Opportunities To Conspire**

78.     Prior to and during the Class Period, high level representatives of Defendants (and/or their parents, subsidiaries, and affiliates) had opportunities to, and frequently did, communicate with each other.

79.     In the Minebea Information, the U.S. Department of Justice charged Minebea and its corporate co-conspirator with participating in meetings, conversations, and

communications in order to discuss prices for Small Bearings customers in the United States and elsewhere and to monitor and enforce the previously-agreed price-fixing scheme.

80.       As noted by both the KFTC and the CCS, cartel participants formed "research association" and "study group" fronts to try to conceal their illegal behavior.

81.       The KFTC's investigation revealed an improper scheme whereby Japanese bearing manufacturers created an academic-sounding entity (the "Asia Study Group"), which acted as a conduit through which representatives of the head offices of the bearing manufacturers in Japan reached decisions and engaged in anticompetitive conduct. Decisions, instructions, and other information from Japan were then communicated to the Korean bearings subsidiaries, who then agreed to and improperly acted on the directives from Japan.

82.       As also described by the CCS:

> Representatives of the four Japan Parent Companies attended regular meetings in Japan in the period from as early as 1980 or 1990 until 31 March 2011 . . . . Those regular meetings were known as [redacted] [Asia] Study Group meetings ("ASG"), [redacted] [Asia] Research Association meetings ("ARA") and Aji-Ken meetings . . . . At these meetings, among other things, the Japan Parent Companies discussed and agreed on overall strategies for the Singapore Subsidiary Companies to implement in pursuit of the Market Share and Profit Protection Initiative.

83.       The above referenced meetings, conversations, and communications provided ample opportunity for Defendants and their co-conspirators to coordinate pricing, sales, and market allocation with respect to Small Bearings sold in other parts of the world, including in the United States.

## THE U.S. SMALL BEARINGS MARKET

84.       Based on data from the U.S. International Trade Commission ("U.S. ITC") for the year 2005, direct purchasers of ball bearings in the United States purchased approximately 816,005,000 ball bearings, valued at $2,742,792,000.00. Out of this total U.S. consumption,

approximately 4.5% are "Miniature Ball Bearings." Therefore, in 2005, direct purchasers in the United States purchased approximately 36,720,225 units of Small Bearings, valued at approximately $123,425,640.00.

### FRAUDULENT CONCEALMENT

85.     Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from the assignor of the claims and the Class from at least June 1, 2003 through February 2, 2015, when the antitrust investigation of Small Bearings manufacturers in the United States became public. During that time, the assignor of the claims and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least February 2, 2015.

86.     Defendants and their co-conspirators' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

87.     Defendants and their co-conspirators represented publicly, both to customers and otherwise, that their pricing activities were unilateral. In making those false representations, Defendants and their co-conspirators misled the assignor of the claims and members of the Class as to the true, collusive, and coordinated nature of their price-fixing activities.

88.     Defendants and their co-conspirators' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

89.     In particular, Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss price-fixing and customer and market allocation that affected customers in the United States and elsewhere.

90.     During these secret meetings, conversations, and communications, Defendants and their co-conspirators agreed upon prices affecting customers in the United States and elsewhere.

91.     As a result of their secret coordinated actions, and unbeknownst to the assignor of the claims and the Class, Defendants and their co-conspirators sold Small Bearings to purchasers in the United States at collusive and supra-competitive prices.

92.     Despite due diligence, the assignor of the claims had no knowledge of Defendants and their co-conspirators' unlawful contract, combination, or conspiracy.

93.     The assignor of the claims received pricing information from one or more of Defendants or their co-conspirators. The assignor of the claims had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

94.     The assignor of the claims did not and could not have discovered Defendants and their co-conspirators' unlawful contract, combination, or conspiracy at any earlier date, despite due diligence. Defendants and their co-conspirators undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, meeting at remote locations, using code names to refer to themselves and co-conspirators, making misrepresentations to the assignor of the claims and the Class of the reasons for the prices charged, and engaging in secret conversations concerning the price-fixing of Small Bearings.

95.     Specifically, price increases were often attributed to increases in the cost of inputs, such as steel, when in fact they were the direct result of the conspiracy's secret collusion.

## ANTITRUST INJURY

96.     Defendants' conspiracy caused injury to Plaintiff and members of the Class by suppressing price competition among Small Bearings manufacturers, thereby depriving all direct purchasers of Small Bearings of the benefits of a competitive market, and resulted in the setting of prices of Small Bearings at artificially high levels.

97.     As a direct result of Defendants' conspiracy, Plaintiff and members of the Class have been injured in their business or property in that they paid more for Small Bearings than otherwise would have been the case in a competitive market.

98.     Defendants and their co-conspirators knew and intended that their pricing actions regarding their sales of Small Bearings would have a direct impact on prices for Small Bearings for all direct purchasers of Small Bearings throughout the United States.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)

99.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

100.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Small Bearings sold in the United States, and/or to allocate markets and customers for Small Bearings sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

101.     The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or

stabilized prices, and/or allocated markets and customers, for Small Bearings sold in or into the United States. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

102.     Defendants and their co-conspirators succeeded in fixing, raising, maintaining, and stabilizing the prices, as well as allocating markets and/or customers for Small Bearings sold in the United States during the Class Period.

103.     For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      a.    Restraining trade or commerce by allocating customers or markets, and otherwise fixing, controlling or maintaining, at artificial and supra-competitive levels, the prices at which Small Bearings were sold in the United States;

      b.    Depriving direct purchasers of free and open competition;

      c.    Selling Small Bearings to direct purchasers in the United States at supra-competitive prices; and

      d.    Employing measures to conceal the true nature of their unlawful conduct from Plaintiff and other members of the Class in furtherance of the conspiracy.

104.     As a direct and proximate result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for Small Bearings than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class Representative and its counsel as Class Counsel;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law;

F.      That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.


DATED:  March 17, 2017

/s/ David H. Fink_____
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
38500 Woodward Avenue, Ste. 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

*Interim Liaison Counsel for the Direct Purchaser Plaintiffs*


Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com


Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
  & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU
  & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME  04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com


*Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs*

M. John Dominguez
COHEN MILSTEIN SELLERS
  & TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 833-6575

Matthew W. Ruan
COHEN MILSTEIN SELLERS
  & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797

Solomon B. Cera
Thomas C. Bright
Pamela A. Markert
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230

*Counsel for Plaintiff*